IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| JEFFERY SCOTT SHIPLETT, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:15-cv-00055 |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CAROLYN W. COLVIN, | ) | |
| Commissioner, | ) | By:   Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Jeffery Scott Shiplett asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 6. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence, and that the case must be remanded for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Shiplett filed for DIB and SSI on February 29, 2012. Administrative Record ("R.") 18, ECF No. 9. He was forty-two years old at the time, R. 68, and had worked primarily as a roofer, R. 39. Shiplett alleged disability beginning October 1, 2011,[1] because of lower back problems and a nerve problem in his left leg. R. 68.

Shiplett's claims were denied initially on May 24, 2012, R. 68–77, 79–88, 111–16, and on reconsideration on December 4, 2012, R. 90–99, 101–10, 119–24. Shiplett requested a hearing before an ALJ, which was held on March 13, 2014. R. 143. Shiplett appeared with counsel at the hearing and testified about his past work, medical conditions, and the limiting effect these conditions had on his daily activities. *See* R. 39–58. A vocational expert ("VE") also testified at this hearing regarding the nature of Shiplett's past work and his ability to perform other jobs in the national and local economy. *See* R. 57–65.

On April 21, 2014, the ALJ issued a written opinion denying Shiplett's applications for DIB and SSI. R. 18–29. He found that Shiplett had two severe impairments: degenerative disc disease of the lumbar spine and bilateral carpal tunnel syndrome. R. 20. He determined, however, that neither impairment met or equaled a listing. R. 20–21. The ALJ found that Shiplett had the residual functional capacity ("RFC")[2] to perform light work[3] with some climbing, lifting

---

[1] Shiplett initially alleged an onset date of October 1, 2010, R. 101, but amended the date to October 1, 2011, at the hearing before the ALJ, R. 56.

[2] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

and carrying, and postural limitations. R. 21–27. Relying on the VE's testimony, the ALJ found at step five that Shiplett could perform other jobs that existed in significant numbers in the national and local economy. R. 27–29. Thus, the ALJ ruled that Shiplett was not disabled as defined in the Act from the alleged onset date of October 1, 2011, through the date of his decision. R. 29. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

## III. Facts

*A.    Relevant Medical Evidence*

Shiplett's back problems began in August 2010 when he suffered an injury at work while bending and twisting to lift a large piece of sheet metal. R. 368. He went to the emergency department at Augusta Health on August 13, 2010, with a chief complaint of lower back pain radiating down into his left hip. *Id.* He was diagnosed with an acute lumbar strain, told to rest his back as much as possible, and given Flexeril as a muscle relaxant and Vicodin for pain. R. 369. Shiplett returned to the emergency department a week later. R. 366. An X-ray of the lumbar spine did not reveal any fractures. R. 367. Shiplett had mild tenderness upon palpation over his left lumbar paraspinal muscles, but a normal range of motion without pain. *Id.*  The emergency room doctor noted Shiplett had some mild weakness to his left lower extremity as well as some sensory changes and a normal gait. *Id.* The physician diagnosed possible disk herniation and "back pain." *Id.* Shiplett was advised to visit a primary care physician to follow up for this injury. *Id.* Shiplett was then given Toradol and morphine for pain and two Percocet prior to his discharge, along with prescriptions for Percocet and Medrol Dosepak. *Id.*

---

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

Shiplett again visited the emergency department on November 21 with a chief complaint of lower back pain. R. 362. J. Scott Just, M.D., saw Shiplett and performed a physical examination. *Id.* Dr. Just noted normal strength throughout and no sign of atrophy. *Id.* The exam revealed tenderness in the paralumbar spinal musculature bilaterally, but no thoracic or lumbar spine tenderness. R. 363. Dr. Just diagnosed Shiplett with acute exacerbation of low back pain as well as bilateral carpal tunnel syndrome. *Id.* Shiplett was placed in bilateral Velcro wrist splints and given prescriptions for Flexeril, Naproxen, and Ultram. *Id.* On November 26, Shiplett returned to the emergency department with complaints of tingling of the bilateral hands in the thumb and fingers 2 through 5. R. 360. Doctors determined that the strength in both hands was normal, but his Phalen test was positive. *Id.* Shiplett was advised to continue wearing the Velcro splints, applying ice or heat, and taking the Naproxen and Ultram. *Id.*

On January 20, 2011, Shiplett underwent a right carpal tunnel release performed by Ramon Esteban, M.D. R. 358. On February 10, an exam of his left hand revealed tingling and decreased gross sensation in the median nerve distribution, and he had a positive Phalen test, but a negative Tinel test. R. 406. Because the early indications from his right carpal tunnel release yielded good results, Shiplett decided to proceed with the left carpal tunnel release. *Id.* Dr. Esteban performed the left carpal tunnel release the same day. *Id.*

On June 27, Shiplett first visited Matthew Pollard, M.D. R. 324. Shiplett's chief complaint dealt with back pain radiating into his thighs. *Id.* During the visit, Dr. Pollard conducted a comprehensive orthopedic exam. *Id.* He noted that Shiplett stood with an erect posture and ambulated normally without difficulty; had normal passive range of motion and strength of both lower extremities; had no deformities or tenderness when examining the lumbar spine; and exhibited negative straight leg raise on both the right and left. *Id.* Dr. Pollard assessed

5

Shiplett with chronic lower back pain with pseudo-radicular lower extremity radiation that had not been responsive to medical care since the injury. R. 325. Dr. Pollard scheduled an MRI with plans to follow up once completed. *Id.*

Shashank C. Parekh, M.D., reviewed the results of the MRI on July 6. R. 386. The MRI revealed severe end plate changes, loss of normal disc signal intensity, and disc space narrowing at multiple levels. *Id.* There was no vertebral compression, however, and alignment was normal. *Id.* Prominent disc bulges were present at L3-L4 and L4-L5. *Id.* Dr. Parekh noted the presence of a questionable slight mass effect on the bilateral L5 nerve roots at the L4-L5 level. *Id.* At L5-S1, there was a caudally migrated broad-based left posterolateral disc herniation with mass effect on the left S1 nerve root. *Id.*

Shiplett visited Dr. Pollard on July 13 for a scheduled follow-up after the MRI. R. 323. Dr. Pollard indicated that the MRI revealed degenerative joint disease and degenerative disc disease. *Id.* It also showed a small Herniated Nucleus Pulposus ("HNP") to the left at L5-S1, with some S1 nerve compression. *Id.* Dr. Pollard assessed Shiplett with chronic low back pain, referred him to the pain center at Augusta, set him up for a fast track Epidural Steroid Injection ("ESI"), and gave him a prescription for Mobic. *Id.* Shiplett visited the emergency department again a few days later on July 18, where he was diagnosed with exacerbation of chronic back pain and advised to follow Dr. Pollard's treatment plan. R. 350. On August 22, Shiplett received a lumbar interlaminar epidural injection at L4-L5. R. 348.

Shiplett returned to Dr. Pollard on September 6 for a scheduled follow-up and still reported significant lower back pain. R. 322. Dr. Pollard noted Shiplett had vague sclerotomal radiation down the back of the thighs and that the ESI did not help alleviate any of his pain. *Id.* Dr. Pollard assessed Shiplett with chronic low back pain, which had been ongoing for fifteen

6

months by this time, and attributed it to the degenerative disc disease and bulging disc at L5-S1. *Id.* During this appointment, Dr. Pollard advised Shiplett of his options, including surgery, and ordered a lumbar discography. *Id.*

This discography was performed on September 26, revealing chronic lumbar pain. R. 383. At the L3-L4 level, the exam showed an annular tear anteriorly consistent with a Dallas grade III tear. *Id.* At the L4-L5 level, Shiplett had a radial tear, consistent with a full thickness, or grade V, tear. R. 384. At the L5-S1 level, Shiplett had a full thickness annular tear as well as fraying and disruption of the annular tissues posteriorly, consistent with a grade III tear of the annulus contained within the annular tissues. *Id.* During the procedure, Shiplett said the tears at L3-L4 and L5-S1 were painless and the annular tear at L4-L5 was extremely painful. R. 383. On October 21, Dr. Pollard reviewed the discography results with Shiplett and noted that this pain had been ongoing for sixteen months and that Shiplett had not responded to conservative care. *Id.* During this appointment, Shiplett indicated his desire to proceed with surgery for a circumferential fusion at L4-L5. *Id.* They also discussed the use of narcotic medications, which up to that point had been helping Shiplett, but were not a long-term solution according to Dr. Pollard. *Id.* Dr. Pollard also noted that while surgery could not guarantee that Shiplett would be able to return to his past work as a roofer, he expected Shiplett to be able to find some form of gainful employment. *Id.*

Shiplett underwent surgery for his back on October 18. R. 300. Dr. Pollard performed a laminectomy, specifically an anterior posterior spinal fusion L4-L5 through a direct lateral approach. *Id.* Dr. Parekh reviewed a computerized tomography ("CT") scan immediately following the surgery. R. 380. He reported that the positioning of intradiscal cages at L4-L5 was satisfactory and that there was a metallic stabilization device between L4 and L5 spinous

7

processes. *Id.* The CT scan also showed a bulge at L4-L5, a left posterolateral bulge at L5-S1 with possible minimal mass effect on the left S1 nerve root, postoperative soft tissue air, and normal vertebral alignment. *Id.* Rebecca D. Dameron, M.D., reviewed the post-surgery X-ray and reported similar findings. R. 381. Dr. Dameron also noted marginal osteophytosis involving the superior end plate of L4 and the inferior end plate of L3. *Id.* Once cleared, Shiplett was discharged on October 21 with a scheduled follow-up visit with Dr. Pollard in two to three weeks. R. 298.

Shiplett had his first follow-up visit with Dr. Pollard on November 7. R. 320. Subjectively, Shiplett reported that he was still in a fair amount of pain, both from the incisions and in his left leg, throughout his thigh and down to his ankle. *Id.* Dr. Pollard indicated that the pain was likely approach based. *Id.* He also reported that the incisions had healed and that the X-rays revealed a healing fusion in the back. *Id.* Dr. Pollard scheduled Shiplett for a follow-up in one month, gave him prescriptions for oxycontin and Neurontin, refilled his oxycodone, and told him to supplement with Tylenol and Motrin. Id.

On December 1, Shiplett went to the emergency department at Augusta Health because of his back pain. R. 344. Shiplett denied any recent falls and withdrawal symptoms, but noted that his leg occasionally gave out on him, and he claimed persistent pain since the surgery. *Id.* He was examined by Thomas Carter, M.D., who diagnosed him with acute-on-chronic lumbar pain with a history of degenerative disc disease. R. 345. Dr. Carter performed a physical examination that revealed tenderness in the left lumbosacral distribution, a positive straight-leg raise test on the left, good deep tendon reflexes throughout the lower extremities, and decreased plantar flexion and dorsiflexion on the left. *Id.* Dr. Carter wrote prescriptions for Dilaudid, Phenergan,

Toradol, oxycodone, and Flexeril. *Id.* Shiplett was instructed to follow-up with Dr. Pollard as soon as possible. *Id.*

Shiplett saw Dr. Pollard later that week on December 7. R. 319. Dr. Pollard noted that Shiplett was still subjectively experiencing pain and had weakness with knee extension. *Id.* X-rays revealed a stable healing fusion at L4-L5, but Dr. Pollard still assessed lumbar radiculopathy. *Id.* He noted that the left lower extremity was radiating pain, likely representing L4 radiculopathy caused by retraction during the surgery. *Id.* Dr. Pollard refilled Shiplett's Neurontin, gave him a prescription for Dilaudid, and scheduled him for an electromyogram/nerve conduction study ("EMG/NCS") and a follow-up appointment in one month. *Id.*

During his January 9, 2012, follow-up with Dr. Pollard, Shiplett indicated that although his pain had improved somewhat since his last visit, he continued to experience pain radiating into his left thigh. R. 318. Dr. Pollard reviewed Shiplett's recent MRI and EMG/NCS and noted some evidence of an acute on chronic L4 nerve irritation. *Id.* Exams revealed no complications at the surgery site, and Dr. Pollard found the possibility of discitis to be doubtful. *Id.* Dr. Pollard still assessed chronic post-operation L4 radiculopathy. *Id.* As a result, he changed Shiplett's Dilaudid dosage, doubled his Neurontin, and requested a pain management evaluation. *Id.* Dr. Parekh also reviewed Shiplett's MRI, and found evidence of asymmetric disc bulge at L4-L5, development of severe endplate changes in the L4 and L5 endplates, small bulge at L3-L4, and posterior annular tear and small broad-based disc herniation without significant root compression at L5-S1. R. 375. Shiplett returned to Dr. Pollard on January 25 and reported he continued to have pain in his left lower extremity. R. 313. Dr. Pollard's assessment remained unchanged, and he scheduled Shiplett for a nerve sleeve injection and a follow-up in six weeks. *Id.* On February

9

15, Sarah L. Knieval, M.D., performed a transforaminal epidural injection on Shiplett. R. 373. Dr. Knieval's notes confirm that the most recent MRI revealed a disc bulge with some displacement of the left L4 nerve root. R. 342.

On March 26, Shiplett saw Dr. Pollard again. R. 308. Shiplett conveyed that the pain caused weakness in his left thigh. *Id.* Dr. Pollard noted that the recent spinal injection did not help and that Shiplett had 4-/5 quad strength with evidence of wasting. *Id.* Noting little to no improvement in Shiplett's condition six months after surgery, Dr. Pollard changed his assessment to chronic pain. *Id.* He noted, "[u]nfortunately we are likely looking at a permanent nerve injury," and he indicated he would try to obtain a second surgical opinion. *Id.* Dr. Pollard refilled Shiplett's Dilaudid and Neurontin and scheduled another follow-up in six months. *Id.* An X-ray taken that day revealed osteophytes, but no spondylolisthesis and no change in the position or alignment of Shiplett's spine. R. 311. On March 30, Dr. Pollard wrote a letter to William Sukovich, M.D., referring Shiplett to him for a second opinion. R. 418. Although there is evidence that this second opinion was obtained, *see* R. 424, the specifics of Dr. Sukovich's opinion are not in the record.

On May 22, Shiplett was referred to DDS for a physical therapy consultation as part of the original disability determination process. R. 338. James D. Griffith, P.T., performed the exam. *Id.* Griffith found that Shiplett's right lateral rotation was 25 degrees and his left lateral rotation was 23 degrees, with 0–30 degrees being normal. R. 327. Griffith indicated that in Shiplett's lower extremities, his strength in his right side was 5 of 5, but in his left side, his gluteus was 4, his iliopsoas was 3, his quadriceps were 2+, his hamstrings were 4, and his calf and dorsiflex were both 5. R. 328. All of his upper extremities were rated at 5. *Id.* In terms of his coordination, finger-nose was normal on both sides, and heel-knee was normal on the right, but

10

abnormal on the left. *Id.* Shiplett's gait, hopping, arm swing, and "Str-Away" were all abnormal on the left side. *Id.* As to station, only his testing of one foot on the left side was abnormal as it showed moderate knee break, and the rest were graded normal.[4] *Id.* A Babinksi response was present in the right, but absent in the left. *Id.* Shiplett exhibited no reflexes in his left patella and depressed reflexes in his left Achilles, but his remaining tested reflexes were otherwise normal. *Id.* After finishing his consultation, Griffith determined, without elaboration, that no therapy services were required for Shiplett. R. 338.

Shiplett returned to the emergency department on June 18, complaining of an exacerbation of his lower back pain with radiation into his left lower leg and foot. R. 336. Shiplett stated that he had fallen over the weekend, likely causing the exacerbation. *Id.* The treating doctors noted that he had some tenderness to palpation on the left side, which extended into the posterior aspect of the left hip. *Id.* Shiplett was diagnosed with acute exacerbation of chronic low back pain with left sciatica and discharged in stable condition. *Id.*

Shiplett next saw Dr. Pollard on July 12 for an unscheduled visit. R. 420. Objective exams showed wasting and weakness of the left lower extremity. *Id.* Dr. Pollard did not observe pain, instability, or crepitation with the range of motion of the left hip, knee, or ankle. *Id.* He assessed chronic pain caused by a femoral nerve injury. *Id.* He noted that even if permanent damage existed, he still expected the pain to ameliorate over time. *Id.* Dr. Pollard also indicated during this appointment that he gave Shiplett information about long-term pain solutions that did not involve the use of narcotics. *Id.*

---

[4] The evaluation form used by Dr. Griffith indicates that if any of the tests showed abnormal results, the treating doctor should grade the abnormality as mild, moderate, or severe. R. 328. While Dr. Griffith did make some notes next to some of the abnormalities, many are illegible and where the notes are legible, they do not indicate whether the abnormality was judged to be mild, moderate, or severe. *Id.*

11

Shiplett saw Dr. Pollard again on August 8 after Dr. Pollard had reviewed Shiplett's most recent EMG/NCS. R. 424. Dr. Pollard noted that the L4-L5 level appeared to be fusing as expected. *Id.* He also stated that the EMG/NCS showed signs of active nerve compression, which did not make sense to him given that the surgery took place ten months prior. *Id.* The MRI, however, did not show any nerve compression. *Id.* Dr. Pollard again assessed chronic pain, and noted his opinion that Shiplett might benefit from a spinal cord stimulator. *Id.* A week later, on August 15, Dr. Pollard wrote a letter expressing his assessment that Shiplett experienced a "rough recovery" from surgery ten months earlier and had "permanent nerve damage in the left leg resulting in weakness and chronic pain." R. 417. He opined that Shiplett was "totally and permanently disabled." *Id.* When Shiplett next saw Dr. Pollard on October 10, he showed no sign of improvement. R. 430. Dr. Pollard noted that only Dilaudid seemed to help Shiplett's pain, so he would continue with that and stop using the methadone. *Id.*

On October 31, Shiplett's family found him unresponsive. R. 457. He was taken to the emergency department where he was treated for a drug overdose. *Id.* Shiplett had been found with bottles of Xanax, *id.*, and a toxicology urine drug screen on October 31 showed he tested positive for cocaine, opiates, benzodiazepines, methadone, and oxycodone, R. 570–71. Shiplett remained in the hospital for a week, during which time he denied any depression or suicidal ideation. R. 570. He was eventually discharged on November 8. *Id.*

Shiplett's next visit to Dr. Pollard took place on December 12. R. 445. His symptoms had not changed, and Dr. Pollard diagnosed him with unspecified drug dependence in addition to the chronic pain. *Id.* Dr. Pollard also noted during this visit that his attempts to get Shiplett an appointment at the pain management center had been hindered because Shiplett had not returned the requested paperwork. *Id.* Dr. Pollard indicated he would not prescribe Shiplett any more

12

addictive narcotics because of his recent drug overdose; he also wanted to obtain new imaging studies and have Shiplett try physical therapy. *Id.* Otherwise, Dr. Pollard continued to refill Shiplett's non-narcotic medications and scheduled a follow-up. *Id.*

On January 24, 2013, Shiplett submitted an intake questionnaire for the pain management clinic at Augusta Health. R. 537–46. He reported experiencing constant pain, primarily in his lower back and left leg, from his hip through his thigh, and all the way down to his calf. R. 543. On a 0–10 scale, with 0 being no pain and 10 being "pain as bad as you can imagine," Shiplett rated his pain between 7 at the least and 8 at the worst in the previous 24 hours; 8 on average; and 8 at the time of filling out the form. R. 541. He indicated that he was currently using Tylenol and Ibuprofen to treat the pain, but they only afforded about 10% relief. R. 540. Shiplett also indicated that while he was not currently taking narcotic pain medication, he still felt it was right for him because it had helped with his pain management needs. R. 545. He did, however, express an interest in non-narcotic medication only if such medications helped. *Id.*

On May 16, Dr. Parekh reviewed another MRI and X-ray. R. 522. Dr. Parekh compared them with the exams from January 5, 2012. *Id.* The most recent imaging revealed that Shiplett's spinal alignment and curvature were normal, but showed degenerative disc disease from L3-L4 to L5-S1. *Id.* Imaging also showed postoperative changes at L4-L5, chronic changes in the L4-L5 end plates, well maintained disc space, and no vertebral compression. *Id.* Small disc bulges were present at L3-L4 and L4-L5, but there was no significant nerve root compression. *Id.* Dr. Parekh identified small broad-based left posterolateral disc herniation at L5-S1, with minimal mass effect on the left S1 nerve root, and slight caudal migration of the herniated disc. *Id.*

On June 17, Shiplett had another follow-up with Dr. Pollard. R. 444. Dr. Pollard indicated that Shiplett's pain had not abated and that his left thigh was smaller than his right. *Id.*

13

He also noted that Shiplett had decreased strength on his left side. *Id.* Dr. Pollard reviewed Shiplett's MRI and noted mild degenerative changes with no obvious complications at the surgical site and a small HNP at L5-S1. *Id.* Dr. Pollard assessed Shiplett with chronic pain and opined that Shiplett should receive disability. *Id.* He also stated that a repeat EMG/NCS could be useful. *Id.*

On July 8, Shiplett visited the pain management center at Augusta Health and saw Victor C. Lee, M.D. R. 547–56. A physical examination revealed no visible or palpable bony abnormalities of the lumbar spine. R. 553. No significant lumbar facet tenderness was noted, and the lumbar range of motion was full. *Id.* Dr. Lee found mild sacroiliac tenderness on the left, and seated straight leg raise test was positive on the left. *Id.* Lower extremity range of motion was also full, and no trochanteric tenderness was noted. *Id.* Internal and external rotation of the hips produced trochanteric pain on the left, but not on the right. *Id.* External rotation of the bilateral hips did not produce sacroiliac or inguinal pain. *Id.* Neurologically, Hoffman signs were absent. *Id.* Lower extremity sensation was intact, with the exception of left L4 and S1 dermatome. *Id.* The lower extremity strength was rated grossly 4+/5, with the left lower extremity, the extensors, and left hip flexors rated 3+/5, and the right lower extremity rated 5/5 throughout. *Id.* Additionally, left lower extremity reflexes could not be elicited, but deep tendon reflexes at the right patellar tendon rated 2/4, and the right Achilles rated 1/4. *Id.* Overall, Dr. Lee noted the following impressions: 1) chronic left lower extremity pain and dysesthesias; 2) lumbar radiculopathy; 3) postlaminectomy pain syndrome in the lumbar spine; 4) lumbar degenerative disc disease with spondylosis; and 5) HNP at L5-S1. *Id.* Dr. Lee recommended Shiplett return for a left S1 and L4 transforaminal ESI, but he expressed skepticism at the chances of success given Shiplett's longstanding L4 pain. *Id.* He also started Shiplett on Lyrica 75 mg at nighttime and

noted that opioids would be avoided because of Shiplett's recent overdose. *Id.* Dr. Lee performed

the planned transforaminal ESI on December 2. R. 455.

On December 16, Shiplett returned to Dr. Pollard. R. 443. Shiplett indicated that he felt

the ESI did not help and that he continued to have pain in his left thigh. *Id.* Dr. Pollard assessed

Shiplett with chronic pain that had not been improving. *Id.* He gave Shiplett a prescription for

Mobic, Ultram, and Lyrica at Shiplett's request, encouraged Shiplett to follow up with the pain

center, and ordered another EMG/NCS. *Id.*

On January 15, 2014, Dr. Pollard provided information and his opinion in a lumbar spine

RFC questionnaire for Shiplett. R. 437–41. He had seen Shiplett fifteen times over the previous

two-and-a-half years and had diagnosed him with chronic pain with a prognosis of permanent

disability. R. 437. These conclusions were based on EMG showing nerve injury. *Id.* Shiplett was

not a malingerer, and he had symptoms of sharp, constant, left thigh and back pain, as well as

cramping and weakness. *Id.* Reduced range of motion, sensory loss, reflex changes, muscle

spasm, muscle atrophy, and muscle weakness showed positive objective signs of Shiplett's pain.

R. 437, 440. Shiplett's impairments were reasonably consistent with the symptoms and

functional limitations described in his (Dr. Pollard's) evaluation. R. 440. Shiplett's pain was

severe enough to frequently[5] interfere with the concentration and attention needed to perform

even simple work tasks. *Id.* His medications caused side effects of upset stomach and

drowsiness, which could affect his ability to work. *Id.* Shiplett's impairments had lasted, or could

be expected to last, at least twelve months. *Id.* Dr. Pollard opined that Shiplett's impairments

limited him to walking less than one city block without rest or severe pain; sitting for one hour at

a time before needing to get up; standing for fifteen minutes at a time; and sitting and standing or

---

[5] For the purposes of this evaluation, "rarely" means 1% to 5% of an eight-hour work day; "occasionally" means 6% to 33% of an eight-hour work day; and "frequently" means 34% to 66% of an eight-hour work day. R. 440.

15

walking less than two hours each in an eight-hour work day. R. 439, 440. Dr. Pollard also indicated that Shiplett would not need to include periods of walking around during an eight-hour workday because walking made the pain worse; he would need a job that permitted shifting positions at will from sitting, standing, or walking; he would need to take roughly eight unscheduled breaks ranging from fifteen minutes to one hour during a typical eight-hour workday; for periods of prolonged sitting, his leg should be elevated waist high for 50–75% of the eight-hour work day; and he would need to use a cane at times when engaged in occasional standing or walking. R. 439. Dr. Pollard opined that Shiplett could rarely lift and carry less than ten pounds in a competitive work situation; could rarely twist and stoop (bend); could never crouch/squat and climb ladders; and could occasionally climb stairs. R. 438. Shiplett would not have significant limitations with reaching, handling, or fingering, and during an eight-hour workday, he could use both hands to grasp, turn, and twist objects 50% of the time; both arms for reaching, including reaching overhead, 50% of the time; and his right fingers 50% of the time, and his left fingers 40% of the time for fine manipulations. *Id.* Dr. Pollard also indicated that Shiplett was likely to have good days and bad days, he would miss more than four days of work per month because of his impairments, and his symptoms and limitations dated back to August 2010. *Id.*

       The results of Shiplett's most recent EMG study also came back on January 15. R. 454. Michael Valente, D.O., communicated these findings to Dr. Pollard by letter on January 17. *Id.* Dr. Valente stated that the study showed very mild and chronic radicular changes involving elements innervated by the L4 and/or L5 nerve root complex. *Id.* These findings were consistent with Shiplett's clinical history and indicated a resolution of what appeared to be a very severe nerve root irritation/injury seen in the July 2012 EMG. *Id.* Dr. Valente further noted that there

were no signs of active or ongoing nerve root irritation and no signs to suggest a femoral neuropathy or lumbosacral plexopathy. *Id.* Dr. Valente acknowledged that Shiplett still experienced severe pain, but concluded that this pain could ultimately be muscular and/or myofascial in nature. *Id.*

Dr. Pollard confirmed these findings during Shiplett's next follow-up appointment on January 22. R. 442. He noted that the nerve injury was no longer acute, seemed to have healed some, and no longer involved any active irritation. *Id.* For his assessment, Dr. Pollard still indicated that Shiplett had chronic pain that was most likely multifactorial. *Id.* Dr. Pollard also stated that while he believed Shiplett likely had some degree of nerve damage, it seemed to be healing and at the least was not worsening. *Id.* Dr. Pollard concluded that he was unsure of what to offer Shiplett and continued him on the non-narcotic medications. *Id.*

On February 26, Shiplett had a follow-up with the pain management center and saw John T. Rhodes, PA–C. R. 581–86. Rhodes noted that Shiplett had an antalgic gait and muscle weakness. R. 582. He spent the majority of the time counseling Shiplett on pain management. R. 581. A spinal cord stimulator was discussed, and Shiplett was referred to Psychiatry SCS for an evaluation. *Id.*

B.      *DDS Physician Opinions*

On May 23, 2012, as part of the initial review of Shiplett's claim, DDS expert William Amos, M.D., assessed Shiplett's physical functioning. R. 72–75, 83–86. Dr. Amos assessed Shiplett's RFC for two separate periods, the first from October 1, 2010, through October 17, 2011, and the second from October 18, 2011, through October 18, 2012. *Id.* Dr. Amos came to the same conclusions for both periods. *Id.* He found that Shiplett could lift and carry twenty pounds occasionally and ten pounds frequently, and he could stand or walk for six hours and sit

17

for six hours in an eight-hour work day. R. 73–74, 83–85. As to Shiplett's postural limitations, Dr. Amos found that Shiplett could frequently balance and could occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. *Id.* On reconsideration in an opinion dated December 4, 2012, DDS reviewer R.S. Kadian, M.D., reaffirmed Dr. Amos's findings, except that he limited Shiplett to four hours of standing or walking during an eight-hour work day. R. 96–97, 107–08. Dr. Kadian also noted that Shiplett had degenerative disc disease. *Id.*

C.     *Shiplett's Submissions and Testimony*

Shiplett submitted three function reports as part of his disability application. R. 230–37, 262–69, 277–84. Shiplett said that he lived at different times with his children, R. 230–31, and his mother, R. 277. He initially described a daily routine in which he would get up, make breakfast, read the newspaper, walk around the house, watch television, vacuum and make his bed, eat lunch, walk around the house again, watch television, eat dinner, watch television, shower, and go to sleep. R. 230. His function reports indicate that this routine dwindled throughout 2012 to the point that his ability to undertake his usual daily tasks depended on his level of pain. R. 262, 277. Shiplett initially prepared his own meals, including sandwiches, cereal, frozen dinners, microwaveable meals, and complete dinners, R. 232, 264, but by November 2012 claimed that pain often prevented him from ever preparing meals, R. 279. Shiplett stated that at first he was able to do some cleaning around the house, vacuuming, and laundry, and could cut the grass with a riding mower, R. 232, but eventually could only do very little mowing and laundry and then at a slower pace with encouragement from others, R. 279. He went outside alone daily, and he could drive and ride in a car, shop for personal items and food on a limited basis, and handle his own finances. R. 233, 265, 280. Shiplett spent time socializing by talking with others and playing card and board games, at first daily, R. 234, but eventually on

18

a limited basis, R. 266, 281. He did, however, go to church weekly and did not need anyone to accompany him. R. 234, 266, 281. Shiplett stated he did not have any problems getting along with others, but was no longer as active as he was before his injury. R. 235, 267, 282. He claimed in all three function reports that his pain caused limitations in lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing, *id.*, as well as sitting, R. 267, 282, and completing tasks, R. 235, 267. He also stated that the pain occasionally caused his leg to give out on him, R. 231, 263, 278, and that he used a walker, R. 236, 268, 283. Other than his leg giving out and his back aching while using the toilet, Shiplett did not have any problems with personal care. R. 232, 263, 278.

At his administrative hearing, Shiplett testified that he lived with his mother and nephew, his daughter drove him to the hearing, and on the way he needed to stop to take a break and stretch because of the pain. R. 46. Shiplett testified that he had good days and bad days, but that the bad days outnumbered the good days. R. 45. On his good days, he claimed he would try to shop for his own food. When shopping, he still had to take breaks and find places to sit down, but most of the time someone else would do his shopping for him. R. 48. On his good days, he would also try to complete chores, such as vacuuming, but frequently needed breaks. R. 51. On his bad days, which he estimated at about twenty days per month, he testified he needed to lie down for four-to-six hours per day to alleviate the pain in his back. R. 45–46. He claimed that his nephew would prepare any meals more extensive than frying an egg and that if he did cook, he had to lean up against the refrigerator. R. 48. He also claimed he would lean against the furniture for assistance when he moved about the house and that on occasion his leg would give out. R. 42–43. When it did, he would try to catch himself, but if he could not, he stated he needed help getting up from the floor. R. 43. Shiplett also testified that he was no longer as active as he used

19

to be when he would play sports such as volleyball and softball. R. 52. He stated that he tried to

play volleyball once after surgery, but only lasted a few minutes and had not tried to play again.

*Id.* As to his limitations, Shiplett testified that at most he could walk for ten or fifteen minutes,

but would need to take breaks and sit down. R. 40–41. He stated his lower back was in constant

pain and his left leg would get tingly and numb from his hip through his thigh and down past his

knee into his ankle and foot. R. 41. He testified that he noticed a loss of strength in his left leg

compared to his right leg, *id.*, and that he frequently used a cane, prescribed by Dr. Pollard, when

he left his house. R. 42.

## IV. Discussion

On appeal, Shiplett argues that the ALJ wrongly denied his claims and cites two errors.

Shiplett contends that the ALJ erred in concluding that Shiplett did not have an impairment that

met or medically equaled the severity of Listing 1.04A. Pl. Br. 1, ECF No. 13. Shiplett also

aaserts that the ALJ erred by failing to apply the correct legal standard concerning his treating

physician's opinion and the medical consultant's opinion. *Id.* at 1–2.

A.     *Listing Argument and Medical Equivalency*

Shiplett challenges the ALJ's opinion by first arguing that he met the criteria of Listing

1.04A, or, in the alternative, that his impairment was medically equivalent in severity to that

listing. The listings are examples of medical conditions that "ordinarily prevent a person from

working" in any capacity. *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990); *see also* 20 C.F.R. §§

404.1525(a), 416.925(a). A claimant's severe impairment "meets" a listing if it "satisfies all of

the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-

year] duration requirement." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3); *see also Zebley*, 493

U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the

20

specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

An adult claimant whose severe medically determinable impairment meets a listing is presumed disabled regardless of his or her vocational profile. 20 C.F.R. §§ 404.1525(c), 416.925(c). Thus, proving "listing-level severity" requires the claimant to demonstrate a greater degree of physical or mental impairment than the baseline statutory standard of being unable to perform "substantial gainful activity." *Zebley*, 493 U.S. at 532. A claimant who can satisfy a listing, however, "is entitled to a *conclusive* presumption that he is [disabled]." *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (emphasis added) (citing *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)); *accord* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Thus, the ALJ generally must identify the relevant listed impairments and "compare[] each of the listed criteria" to the medical evidence in the claimant's record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *see also Radford*, 734 F.3d at 295.

To meet the listing for degenerative disc disease of the lumbar spine, a claimant must show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.04A. The Fourth Circuit has held that to meet the listing, a claimant must show that all four symptoms are present in conjunction with the duration requirement, i.e., "that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. The Fourth Circuit in *Radford* rejected the Commissioner's argument that the claimant must show that each symptom was present

21

simultaneously and instead held that a claimant can meet the listing "by showing that he experienced the symptoms 'over a period of time,' as evidenced by 'a record of ongoing management and evaluation.'" *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, App. 1, 1.00D).

Although the ALJ's analysis at step three was deficient, Shiplett's argument that he met the listing criteria is ultimately not persuasive on this record. In his opinion, the ALJ merely recited the standard from the regulations and concluded that Shiplett did not meet it, but he did not provide any additional analysis or explanation. At step three, in order to facilitate meaningful judicial review, the ALJ has the duty to explain his rationale for whether the claimant meets or equals a listing. *See Lambert v. Colvin*, No. 7:14cv171, 2016 WL 721523, at *4 (W.D. Va. Feb. 4, 2016) (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)), *adopted by* 2016 WL 742122 (Feb. 23, 2016). Discussion of the medical evidence in other sections of the written opinion may supplement the ALJ's step-three analysis. *Id.* But here, the ALJ's discussion of the medical evidence at step four does not support his conclusion at step three that "there is no indication in the record that [Shiplett's impairment] is associated with" any of the elements in the listing. R. 20–21. Shiplett points to multiple occurrences in the record where he displayed symptoms consistent with many of the elements of the listing. Pl. Br. 4–7. For example, numerous treatment notes indicate that imaging showed signs of active nerve compression. R. 318, 342, 424, 437. Additionally, throughout his treatment history, physical examinations showed limitation of motion of the spine, R. 327, 440, evidence of muscle weakness accompanied by reflex loss, R. 308, 328, 420, 440, 444, 553, and two positive straight leg raising tests on the left, R. 345, 553. As such, the ALJ's overarching conclusion that Shiplett failed to prove any of the elements of the listing is incorrect.

Shiplett admits, however, that the record does not contain evidence of both a sitting and supine positive straight leg raising test,[6] but during oral argument his counsel attributed that evidentiary deficiency to a common practice amongst doctors of performing only one version of the test. Shiplett may be correct that this is a common practice, but the record says nothing about it. The absence of positive findings from both sitting and supine straight leg raising tests is enough to prevent Shiplett from meeting the listing – his argument about a purported common practice amongst doctors notwithstanding – because the text of the regulation is clear that he must demonstrate evidence of both variations in order to qualify. 20 C.F.R. pt. 404, subpt. P, App. 1, 1.04A (requiring "positive straight-leg raising test (sitting and supine)" to meet the listing); *see also Radford*, 734 F.3d at 293 ("The first step in construing a regulation is to consider the text . . . ."); 20 C.F.R. pt. 404, subpt. P, App. 1, 1.00D ("Alternative testing methods should be used to verify the abnormal findings; e.g., a seated straight-leg raising test in addition to a supine straight-leg raising test."). The ALJ's inadequate explanation, then, is ultimately harmless because Shiplett has not shown, and the record does not reveal, that he actually met all the elements in the listing, particularly both forms of positive straight leg raising test. Thus, Shiplett is not entitled to the presumption of disability that accompanies meeting the listing. This does not, however, end the step-three inquiry.

During oral argument, Shiplett also argued that the evidence shows that his impairment medically equaled the severity of the listing, and thus the ALJ should have found Shiplett disabled at step three. Evaluating equivalency depends on whether the claimant's impairment is listed, unlisted, or a combination of both. 20 C.F.R. §§ 404.1526(b), 416.926(b). If the

---

[6] Shiplett mistakenly identifies a visit to the emergency department on December 1, 2011, as the only time a straight leg raising test was performed after the alleged onset date. Pl. Br. 6. A review of the record reveals that Shiplett also had a positive seated straight leg raising test on the left on July 8, 2013. R. 553. Still, the evidence does not show that Shiplett had a supine straight leg raising test performed.

23

impairment is listed, as is the case here, a claimant may show equivalency when there are "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. §§ 404.1526(b)(1)(ii), 416.926(b)(1)(ii). In other words, "[a]n impairment or combination of impairments is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment." *Vest v. Astrue*, No. 5:11cv47, 2012 WL 4503180, at *3 (W.D. Va. Sept. 28, 2012).

Although the ALJ's inadequate analysis is harmless as to whether Shiplett actually met the listing criteria, as discussed above, the record could support a finding that Shiplett's degenerative disc disease is equivalent in severity and duration to the listed elements. As described below, the ALJ does not provide any meaningful analysis of the evidence in the record, especially pertaining to Shiplett's treating physician Dr. Pollard's treatment notes; instead, he merely summarizes the medical evidence without any further explanation.[7] When the record contains conflicting evidence, the ALJ must explain how and why he resolved the conflict in reaching his conclusion. This deficiency frustrates the Court's ability to review the ALJ's rationale for his listings determination. On remand, therefore, the ALJ must assess and adequately explain his conclusions concerning Shiplett's medical equivalency argument.

## B.     *Treating Physician Argument*

Shiplett next argues that the ALJ erred by misapplying the law in assessing the opinions of Shiplett's treating physician, Dr. Pollard, and the DDS consulting physicians. An ALJ must

---

[7] Additionally, the DDS physicians did not assess equivalency. *See* R. 71, 82, 95, 106; 20 C.F.R. §§ 404.1526(e), 416.926(e) ("[A] State agency medical or psychological consultant or other designee of the Commissioner has the overall responsibility for determining medical equivalence" when the "State agency or other designee of the Commissioner makes the initial or reconsideration disability determination.").

consider and evaluate all opinions[8] from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. §§ 404.1527, 416.927. The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* §§ 404.1527(c), 416.927(c). A treating physician's opinion "is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Conversely, opinions from non-treating sources are not entitled to any particular weight. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178. The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Furthermore, in determining what weight to afford a treating source's opinion, the ALJ must consider all relevant factors, including the relationship— in terms of length, frequency, and extent of treatment—between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, the consistency of the opinion with the record as a whole, and whether the treating physician's opinion pertains to his or her area of specialty. *Id.* The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

---

[8] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

25

Here, the ALJ's analysis of Dr. Pollard's various functional assessments of Shiplett is inadequate. On October 12, 2011, the week before Shiplett's surgery, Dr. Pollard opined that although there was no guarantee that Shiplett would return to his work as a roofer, he expected Shiplett to find some form of gainful employment after back surgery. R. 321. The ALJ afforded significant weight to this opinion because the surgery was properly completed and Shiplett did not need to repeat the procedure. R. 27. In a second opinion provided on August 15, 2012, Dr. Pollard indicated that Shiplett was totally and permanently disabled because of nerve damage in the left leg, which resulted in weakness and chronic pain. R. 417. The ALJ assigned this opinion limited weight because "Dr. Pollard provided no specific objective findings in support of such opinion and . . . . Dr. Pollard's opinion is conclusory in nature and on an issue that is reserved to the Commissioner and is not otherwise supported by the other substantial evidence of record." R. 27. In a third opinion given on June 7, 2013, Dr. Pollard asserted that because Shiplett's left lower extremity was smaller than the right and because he had decreased strength on the left, Shiplett was disabled and Dr. Pollard believed he should get disability. R. 444. The ALJ assigned this opinion limited weight because "Dr. Pollard did not provide any functional limitations/restrictions whatsoever in support of such opinion, and such opinion is conclusory in nature and is on an issue that is reserved to the Commissioner." R. 27. In his final opinion given on January 15, 2014, Dr. Pollard completed an RFC questionnaire and limited Shiplett to sitting and standing or walking for less than two hours each in an eight-hour workday and rarely lifting and carrying less than ten pounds. R. 437–41. The ALJ gave this opinion little to no weight because "Dr. Pollard merely checked off objective findings . . . and such objective findings are not consistently noted in Dr. Pollard's treatment notes. Moreover, they are not consistently noted elsewhere in the medical evidence of record." R. 27.

In addition to this discussion of Dr. Pollard's opinions, the ALJ recited the treatment notes from each of Shiplett's visits with Dr. Pollard. The ALJ did not discuss many of the factors he was required to consider when determining how much weight to assign to the treating physician's opinion. The ALJ also contradicted himself by dismissing two of Dr. Pollard's opinions that Shiplett was disabled because the ALJ found that such opinions were on matters reserved to the Commissioner, while giving significant weight to Dr. Pollard's pre-surgery opinion that Shiplett could return to work, which is also an issue reserved to the Commissioner. In assigning the pre-operation opinion more weight, the ALJ explained that Shiplett did not undergo a second surgery and his course of treatment was appropriate. These reasons do not address the nerve damage that arose after the surgery—a condition that Dr. Pollard, and other treating physicians, consistently documented as causing significant limitations. The ALJ's reasons for discounting the January 15 opinion are also inadequate because Dr. Pollard's opinion was indeed consistent with his treatment notes, which noted weakness and other signs in Shiplett's left lower extremity. The fact that Dr. Pollard checked off boxes with his objective findings in a functional assessment does not by itself provide grounds to discount his opinion where his treatment notes support that assessment. *Cf. Chester v. Callahan*, 193 F.3d 10, 13 (1st Cir. 1999) (per curiam) (explaining that the ALJ's reasons for rejecting the treating physician's opinion, i.e., that the treating physician only checked off boxes on a form without providing a narrative report, was not supported by the record when the record did in fact contain narrative reports supporting the clinical findings).

The ALJ's conclusion that Shiplett was not very limited because his treatment was conservative in nature is also flawed. Dr. Pollard indicated that Shiplett decided to pursue surgery as an option precisely because he did not respond to initial conservative care. R. 300,

321. The ALJ's observation that Shiplett did not undergo a second surgery is unpersuasive, as no treating physician recommended another surgery. Dr. Pollard indicated that imaging showed no obvious complications at the surgical site, R. 444, and the L4-L5 appeared to be fusing as expected, R. 424. In fact, Dr. Pollard noted that Shiplett's impairments and pain may resolve with time, even with potentially permanent nerve damage. R. 420. In spite of this apparently successful surgical repair, however, the record plainly shows that Shiplett continued to complain of pain and other symptoms associated with his lower back impairment until 2014. Dr. Pollard's treatment notes contain his observations of medical signs that appear consistent with Shiplett's symptoms. Dr. Valente's observation that a very serious nerve injury appeared to have resolved by January 2014, R. 454, is consistent with Dr. Pollard's observations. The ALJ also overlooked the legitimate reason for discontinuing treatment with narcotics, which Dr. Pollard repeatedly told Shiplett were not a long term solution, after Shiplett's overdose in November 2012, and Shiplett underwent at least three ESIs in an effort to alleviate his pain, none of which were ultimately successful. Thus, although Shiplett's course of treatment following surgery could be fairly characterized as "conservative," this by itself sheds little light on the severity of his symptoms, which were consistently noted as severe during a two year period of recovery from a nerve injury. *See Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) ("A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.").

Assessing the DDS physicians' opinions, the ALJ assigned significant weight to the May 23, 2012, opinion and greater weight to the December 4, 2012, opinion. R. 26. The ALJ explained his assignment of weight by noting the findings of the DDS physicians were "well supported by the relatively benign clinical and laboratory findings and the treatment history," *id.*,

which he had previously characterized as "conservative in nature and essentially limited to the use of medications" and not involving "repeat surgical intervention," R. 24. This conclusion, however, is not supported by substantial evidence.

The ALJ can indeed rely on the opinion of a nonexamining physician when the opinion is consistent with the record. *See Lowery v. Colvin*, No. 4:13cv60, 2015 WL 1780870, at *14 (W.D. Va. Apr. 20, 2015) (citing *Gordon*, 725 F.2d at 235). Here, however, the DDS physicians' opinions do not appear to be consistent with the record. The DDS physicians did not consider any evidence past December 4, 2012, whereas the diagnostic tests show that Shiplett continued to experience nerve root compression until January 2014. *See* R. 437, 442. For example, an MRI reviewed on May 16, 2013, revealed that Shiplett still had nerve root compression as of that date. R. 522. Physical examinations throughout Shiplett's treatment history also revealed persisting signs of weakness in his left lower extremity.[9]

In adopting the DDS physicians' opinions and rejecting most of Dr. Pollard's opinions, the ALJ provided reasons not supported by the record and boilerplate language devoid of any analysis. That the ALJ found Shiplett more limited than the initial DDS physician's opinions in one RFC category (standing and/or walking) "in order to be most fair to [Shiplett]" simply does not offer a reasoned basis for crediting certain opinions or assessing functional limitations. This lack of explanation for the ALJ's findings deprives the Court the opportunity to conduct meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) ("The ALJ stated that he gave that opinion only 'limited weight' based on a determination that 'the objective

---

[9] Dr. Pollard noted wasting in Shiplett's left quadriceps in March 2012, R. 308; wasting and weakness of the left lower extremity in July 2012, R. 420; radiating left lower extremity weakness and decreased strength and size of the left compared to the right in June 2013, R. 444; and reflex changes and signs of muscle spasm, atrophy, and weakness in his RFC evaluation in January 2014, R. 440. Dr. Lee noted that Shiplett's reflexes in his left lower extremity could not be elicited during his examination in July 2013. R. 553.

29

evidence or the claimant's treatment history did not support the consultative examiner's findings.' . . . However, the ALJ did not specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to. As such, the analysis is incomplete and precludes meaningful review."). Therefore, I find that the ALJ's decisions discounting the opinions of Shiplett's treating physician Dr. Pollard and assigning "significant" and "greater" weight to the DDS physicians are not supported by substantial evidence.

C.     *Closed Period*

The ALJ did not address whether Shiplett met the criteria for a closed period of disability. To qualify for disability benefits, a claimant need not show that he or she is permanently or even currently disabled at the time of the hearing. *See Miller v. Comm'r of Soc. Sec.*, No. 13 Civ. 6233, 2015 WL 337488, at *24 (S.D.N.Y. Jan. 26, 2015). The ALJ must evaluate whether a claimant has shown that he or she was disabled for any consecutive twelve-month period between his or her onset date and the date of the hearing. *See id.* "[T]he disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of that time period instead of . . . a snapshot taken [at] the hearing." *Calhoun v. Colvin*, 959 F. Supp. 2d 1069, 1075 (N.D. Ill. 2013). Failure to consider whether a closed period of disability exists may warrant remand. *See, e.g.*, *Reynoso v. Astrue*, No. CV 10-04604, 2011 WL 2554210, at *5–7 (C.D. Cal. June 27, 2011) (remanding for the ALJ's failure to consider whether claimant had a closed period of disability prior to undergoing surgery); *Dounley v. Comm'r of Soc. Sec. Admin.*, No. 3:08cv1388, 2009 WL 2208021, at *8–9 (N.D. Tex. July 22, 2009) (remanding with instructions to consider claimant's entitlement to a closed period where the ALJ relied primarily on medical evidence generated after the surgery that permitted the claimant to return to work).

Here, the evidence in the record, particularly in Dr. Pollard's treatment notes, suggests Shiplett suffered from serious pain and nerve injury from some point after his surgery until January 17, 2014, when Dr. Pollard reviewed the EMG/NCS study that revealed Shiplett no longer had any active nerve root irritation. If Shiplett's degenerative disc disease rendered him disabled for more than twelve months during this period, he would be entitled to at least a closed period of benefits. Therefore, on remand, the ALJ must conduct a more thorough analysis of the record and determine whether the evidence supports awarding a closed period of disability benefits.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, the Court will **GRANT** Shiplett's motion for summary judgment, ECF No. 12, **DENY** the Commissioner's motion for summary judgment, ECF No. 14, **REMAND** this case for further administrative proceedings, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to counsel of record.

ENTER: November 16, 2016

Joel C. Hoppe
United States Magistrate Judge

31